**David OZONOFF, Plaintiff, Appellee,**

v.

**William P. BERZAK, et al.,
Defendants, Appellants.**

**No. 83–1850.**

United States Court of Appeals,
First Circuit.

Argued April 6, 1984.

Decided Sept. 21, 1984.

---

**5.** Our present ruling should come as no surprise to the Heberts' counsel, who was counsel for the plaintiffs in *Kargman.*

Dept. of Justice, Washington, D.C., were on brief, for defendants, appellants.

Leonard B. Boudin, New York City, with whom Eric M. Lieberman, Judith Levin, Terry Gross, and Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., New York City, were on brief, for plaintiff, appellee.

Before CAMPBELL, Chief Judge, BOWNES and BREYER, Circuit Judges.

BREYER, Circuit Judge.

Dr. David Ozonoff, the plaintiff-appellee, would like to work for the World Health Organization ("WHO"), but he does not want to undergo the loyalty check that the American government performs (by agreement with WHO) before WHO will offer a job to an American citizen. The Executive Branch conducts the loyalty check pursuant to the terms of Executive Order No. 10422, 18 Fed.Reg. 239 (Jan. 9, 1953), *reprinted as amended at* 22 U.S.C. § 287. Ozonoff brought this suit, seeking a declaration that the Executive Branch could not investigate his loyalty as a precondition to his employment at WHO, both because the President lacks the constitutional authority to promulgate the Order and because the specific terms of the Order are vaguer and broader than the first amendment allows. The district court agreed with Ozonoff on both counts and granted summary judgment in his favor. We agree with Ozonoff's second claim, namely that specific terms of the Order, as applied to WHO job applicants, violate the first amendment. Since this reason is sufficient to invalidate the Order, thereby eliminating the government's basis for the investigation in question, we affirm the district court's judgment without reaching Ozonoff's other claims.

I

Executive Order 10422 sets the terms and conditions for the loyalty investigations that Ozonoff challenges. The Order, first promulgated by President Truman in 1953, applies to Americans who seek work

Victor D. Stone, Atty., Washington, D.C., with whom William F. Weld, U.S. Atty., Boston, Mass., Benjamin C. Flannagan, Atty., and Daniel E. Fromstein, Atty.,

at the United Nations, *see* Order, Part I, ¶ 1, or with other public international organizations that enter into special loyalty screening agreements with the United States, *id.*, Part III. (See Appendix for the text of the Order.) Since 1953, WHO has maintained such an agreement with the United States (and apparently with no other nation). *See World Health Organization Manual* Part II, ¶¶ 130, 390, 490 (1983) (discussing "special procedures required" by the Executive Order in hiring United States citizens).

The Order provides that the Secretary of State, after appropriate investigation, will report to the international organization whether "there is a reasonable doubt as to the loyalty of the person involved to the Government of the United States." Order, Part II, ¶ 1. It states that, in making this determination, the person's

[a]ctivities and associations ... which may be considered ... may include one or more of the following:

(a) Sabotage, espionage, or attempts or preparations therefor, or knowingly associating with spies or saboteurs.

(b) Treason or sedition or advocacy thereof.

(c) Advocacy of revolution or force or violence to alter the constitutional form of government of the United States.

(d) Intentional, unauthorized disclosure to any person, under circumstances which may indicate disloyalty to the United States, of United States documents or United States information of a confidential or non-public character obtained by the person making the disclosure as a result of his previous employment by the Government of the United States or otherwise.

(e) Performing or attempting to perform his duties, or otherwise acting, while an employee of the United States Government during a previous period, so as to serve the interests of another government in preference to the interests of the United States.

(f) Knowing membership with the specific intent of furthering the aims of, or adherence to and active participation in, any foreign or domestic organization, association, movement, group or combination of persons, which unlawfully advocates or practices the commission of acts of force or violence to prevent others from exercising their rights under the Constitution or laws of the United States, or of any State, or which seeks to overthrow the Government of the United States or any State or subdivision thereof by unlawful means.

Order, Part II, ¶ 2. In making a loyalty determination, the investigating agency is normally to check the files of appropriate governmental agencies, including the FBI and the Office of Personnel Management. If any "derogatory" information is disclosed, the Federal Bureau of Investigation "shall conduct a full field investigation...." *Id.*, Part I, ¶¶ 3–4. A special Loyalty Board receives the results of such investigations. After providing the job applicant with a chance to be heard, it reaches an "advisory determination" about loyalty, which it sends to the Secretary of State, who, in turn, reports the loyalty determination to the international organization.

Dr. Ozonoff, an expert in international health and health planning, has already once been subject to this type of security check. In 1970 he applied for a six-month appointment at WHO in order to prepare a WHO monograph. The FBI undertook a full background investigation; the Department of State conducted an overseas investigation; and several months later the government concluded that there were no reasonable doubts concerning his loyalty. WHO then hired him to write the monograph; he did so; and WHO officials told him they would like to hire him again, perhaps in a permanent position, in the future.

Dr. Ozonoff has again filed an employment application with WHO. He states in an unchallenged affidavit that "representatives of the World Health Organization have indicated a continuing interest in em-

ploying" him, and that he "wish[es] to seek and obtain employment with the World Health Organization as soon as it can be arranged conveniently and without the necessity of obtaining a loyalty-security clearance from the United States government." Ozonoff says that the previous investigation took time, intruded upon his privacy, and injured his reputation. He adds that the loyalty screening program inhibits him from joining the organizations he wishes to join and from expressing views or opinions that he may hold. He also fears that an investigation may end up depriving him of a WHO job. WHO, however, will not proceed with his application until he submits to a loyalty screening, and American authorities have told him that he will need a new clearance to be eligible for renewed employment with WHO. Thus, he must undergo the loyalty screening or lose the job possibility. Faced with this standoff, Dr. Ozonoff brought his federal court suit and obtained a judgment that effectively forbids the loyalty investigation—a judgment that the government challenges on this appeal.

## II

■ The government first argues that the Order does not threaten to cause Ozonoff any real, immediate, or direct injury. In its view, for a court to hear his claim now would violate principles of "standing" —principles which promote sound judicial decisions by assuring that legal questions are presented not abstractly, but embedded in concrete factual contexts, and which minimize friction between courts and individuals, groups, or other governmental bodies by assuring that courts act only when the threat of injury to a plaintiff is real. *See, e.g., Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472–74, 102 S.Ct. 752, 758–59, 70 L.Ed.2d 700 (1982).

The principles of standing determine whether a particular plaintiff is the type of person whom the law intends to protect against the type of harm of which he com-

plains. They are of two sorts—constitutional and 'prudential.'

■ The constitutional standing rules seek to ensure that a concrete Article III "case or controversy" exists by focusing on plaintiff's "harm." They ask whether the plaintiff has "in fact" suffered a redressable injury as a result of the defendant's actions. In the words of the Supreme Court, the plaintiff must demonstrate that his injuries " 'fairly can be traced to the challenged action of the defendant,' or put otherwise, that the exercise of the Court's remedial powers would redress the claimed injuries." *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 74, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 595 (1978) (citations omitted). This language imposes three fairly strict requirements, namely: (1) an injury; (2) a causal connection between the injury and the complained-of acts; and (3) redressability. *See, e.g., Valley Forge Christian College, supra; Munoz-Mendoza v. Pierce,* 711 F.2d 421, 424 (1st Cir.1983).

A plaintiff who has established the constitutional element of standing must go on to convince a court that various 'prudential' considerations also warrant hearing the case. *See, e.g., Valley Forge Christian College,* 454 U.S. at 474–75, 102 S.Ct. at 759–60; *Warth v. Seldin,* 422 U.S. 490, 500–01, 95 S.Ct. 2197, 2205–06, 45 L.Ed.2d 343 (1975). He must show that his "injury" is of a sort against which the law seeks to protect him. *See Valley Forge Christian College,* 454 U.S. at 474–75, 102 S.Ct. at 759–60. He may do so, for example, by showing that the harm of which he complains amounts to a "common law" injury, such as a tort. *See CBS, Inc. v. United States,* 316 U.S. 407, 422, 62 S.Ct. 1194, 1202, 86 L.Ed. 1563 (1942); Stewart, *The Reformation of American Administrative Law,* 88 Harv.L.Rev. 1667, 1723–25 (1975). Or he may show that his claim falls "within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.' " *Valley Forge Christian College,* 454 U.S. at 475, 102 S.Ct. at 760 (quoting *Association of Data*

*Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970)). (At the outset of the case, when standing questions are most often presented, he may have to show only that he is "arguably" within the zone of interests. *Association of Data Processing Service Organizations v. Camp*, 397 U.S. at 153, 90 S.Ct. at 829. *See Munoz-Mendoza v. Pierce*, 711 F.2d at 425). Moreover, the plaintiff's challenge to the defendant's conduct ordinarily must rest on the plaintiff's own legal rights and interests, not those of third parties. *See, e.g., Warth v. Seldin*, 422 U.S. at 499, 95 S.Ct. at 2205. Finally, "when the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction." *Id.*

These prudential requirements are typically excused only in unusual circumstances, such as where Congress has enacted a special "person aggrieved" statute, allowing a plaintiff to act as a "private attorney general," *see* 5 U.S.C. § 702 ("aggrieved ... within the meaning of a relevant statute"); *FCC v. Sanders Brothers Radio Station*, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940), or where a special—*e.g.*, a constitutional—reason exists for allowing one person to assert the interests of another. *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980); *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). *See generally Munoz-Mendoza v. Pierce, supra.*

The only seriously disputed standing issue here concerns the first of these principles. Does the Order cause Ozonoff "some actual or threatened injury?" *Valley Forge Christian College*, 454 U.S. at 472, 102 S.Ct. at 758 (quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979)). We believe that it does.

As Dr. Ozonoff points out, the Order lays down certain standards for determining "loyalty"—standards that take account of political associations and speech. As one who has worked for WHO in the past and who has filed an employment application again seeking work, Ozonoff, more than others, may feel constrained to bring his conduct into conformity with the standards that the Order contains. That means he cannot join associations upon which the Order seems to frown or act in ways the Order suggests would show 'disloyalty,' at least not if he wants to get a job with WHO. The Order is vague enough and general enough to suggest that a serious effort to comply would have an effect—a 'chilling effect'—upon what Dr. Ozonoff says or does, particularly since his behavior in the past was evidently sufficient to trigger a full scale, rather than a cursory, investigation of his associations and activities.

This type of likely effect upon political activity and association has led the Supreme Court in the past to find genuinely threatened, or actual, "injury." It has based standing upon this type of injury when, for example, law students sought to challenge certain bar admission standards, *Law Students Civil Rights Research Council, Inc. v. Wadmond*, 401 U.S. 154, 158–59, 91 S.Ct. 720, 724, 27 L.Ed.2d 749 (1971), and when a teacher sought to challenge a 'loyalty oath,' *Baggett v. Bullitt*, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); *Cramp v. Board of Public Instruction*, 368 U.S. 278, 283–84, 82 S.Ct. 275, 278–79, 7 L.Ed.2d 285 (1961). *See also Steffel v. Thompson*, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). The point of these cases seems to be that, if the plaintiff's interest in getting or keeping a job is real, the likely 'chilling effect' of an apparent speech-related job qualification constitutes a real injury—an injury that warrants judicial inquiry into the lawfulness of the qualification. A similarly concrete injury exists here, for Dr. Ozonoff seeks work with WHO and the Order likely constrains the activities of WHO job applicants. Moreover, if a file check reveals any "derogatory" information about an applicant, the Order requires a full FBI investigation.

Order, Part I, ¶ 4. We know from Ozonoff's past experience that there must be some such information in his file. Thus, the extent of his injury is likely augmented by whatever disruption, delays, or reputational harms might flow from an FBI field investigation.

The government points to *Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), to cast doubt on whether the "chilling effect" of the Order amounts to a real "injury." In *Laird*, a group of citizens challenged the lawfulness of an Army program that gathered and stored information about civil disturbances and "public activities that were thought to have at least some potential for civil disorder." *Id.* at 6, 92 S.Ct. at 2322. The Supreme Court rejected the plaintiffs' efforts to rest standing upon the "chill" that the program cast upon their associational activities. It said that the "jurisdiction of a federal court may [not] be invoked by a complainant who alleges that the exercise of his First Amendment rights is being chilled by the mere existence, without more, of a governmental investigative and data-gathering activity. . . ." *Id.* at 10, 92 S.Ct. at 2324.

The problem for the government with *Laird*, however, lies in the key words "without more." The plaintiffs in *Laird* did *not* claim that the information gathering activities were directed against them specifically or that the gathered data could be directly used against them in any foreseeable way. In fact, in *Laird* the Supreme Court carefully distinguished other cases in which it had allowed standing based upon a regulation's "chilling effects." *See id.* at 11, 92 S.Ct. at 2324 (citing, as examples, *Baird v. State Bar of Arizona*, 401 U.S. 1, 91 S.Ct. 702, 27 L.Ed.2d 639 (1971), *Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), *Lamont v. Postmaster General*, 381 U.S. 301, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965), and *Baggett v. Bullitt*, *supra*). The Court pointed out that in none of those cases

> did the chilling effect arise merely from the individual's knowledge that a governmental agency was engaged in certain activities or from the individual's concomitant fear that, armed with the fruits of those activities, the agency might in the future take some *other* and additional action detrimental to that individual. Rather, in each of these cases, the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging.

408 U.S. at 11, 92 S.Ct. at 2324. (emphasis in original). The other cases (finding standing) to which the Court referred typically involved instances in which the government in effect forced an individual to choose between either (1) bringing his speech or associational activity into conformity with a (typically vague) standard or (2) risking loss of an employment opportunity (or a job). *See, e.g., Baird v. State Bar of Arizona, supra; Keyishian v. Board of Regents, supra; Baggett v. Bullitt, supra.* This same choice is present in the case before us. Our case thus resembles, not *Laird*, in which the Court found no standing, but, rather, the cases that *Laird* distinguished, where standing was found.

The government also argues, in support of its claim that the injury here is too "speculative," that Ozonoff might choose not to proceed with his WHO job application; that, in any case, the FBI may not investigate him; that the Loyalty Board would likely clear him, even after an FBI investigation; and that, even if not, WHO might still offer him the job. The first of these arguments, however, is refuted by Ozonoff's affidavit, *see supra* at 226–27 which the government does not contest. Although the affidavit was written in 1979 and this case has been pending for several years, the record does not suggest that the delay was the fault of Ozonoff or his counsel or that circumstances have changed in any relevant way since the case was filed or the affidavit written. The remaining arguments miss the point, for the issue is not whether Dr. Ozonoff will

likely be denied the job, but whether the Order reasonably leads him to believe he must conform his conduct to its standards. Certainly one reading the Order would think it probable that WHO would not offer a job to a "disloyal" American. Thus, he would reasonably think it necessary to avoid acting in ways that may show "disloyalty" as described in the Order.

■ Once Ozonoff shows "injury," he can easily satisfy the remaining standing requirements. The Order causes the injury. An injunction or declaration that the Order is invalid would prevent the injury in the future. The injury is of the sort that the first amendment "arguably" protects Dr. Ozonoff from suffering. He asserts his own rights, not those of others. And, because of his once and future WHO employment efforts, he suffers the likely injury in a way that most other citizens do not. We also believe that Dr. Ozonoff's efforts to obtain WHO employment lend sufficient concreteness to this case to allow us to decide the legal issues within a specific factual context, rather than "abstractly." Hence, Dr. Ozonoff has standing to contest the Order's lawfulness.

### III

■ Dr. Ozonoff believes that the Order is unlawful for two independent sets of reasons. He argues first that the Constitution does not grant the President the power—without Congressional legislation—to investigate the loyalty of an American who seeks to work for an international organization. *Compare Dames & Moore v. Regan*, 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981) *with Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). We do not believe it necessary for us to decide this question now. We need not reach the first legal question because we agree with Dr. Ozonoff's second basic legal argument, namely, that the Order is unlawful because its terms, when measured against the first amendment's requirements, are unconstitutionally broad. While we recognize that "overbreadth" must be measured in light

of whatever special job-related security requirements that governmental security or foreign policy needs may reasonably dictate, we conclude (for reasons we discuss in detail at pp. 232–33 below) that in this particular case those considerations are not important enough to save the Order.

The constitutional problem with the Order can be seen most clearly by focusing upon two of the factors that "may be considered" in determining "whether ... there is a reasonable doubt as to the loyalty of the person involved to the Government of the United States," namely

(b) Treason or sedition *or advocacy thereof.*

(c) *Advocacy of* revolution or force or violence to alter the constitutional form of government of the United *States.*

Order, Part II, ¶ 2 (emphasis added). These two provisions, in effect, require an American wishing to work at WHO to refrain from certain kinds of *political advocacy.* Does the first amendment, which protects political speech above all else, *see, e.g., FCC v. League of Women Voters,* —— U.S. ——, ——, 104 S.Ct. 3106, 3118–20, 82 L.Ed.2d 278 (1984); *Buckley v. Valeo,* 424 U.S. 1, 14–15, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976) (per curiam); *New York Times Co. v. Sullivan,* 376 U.S. 254, 269–76, 84 S.Ct. 710, 720–23, 11 L.Ed.2d 686 (1964); A. Meiklejohn, *Political Freedom* (1960), allow the government to impose this type of condition?

Three sets of Supreme Court cases together suggest that the answer is "No." First, the Court has expressed, per curiam, the very narrow limits that the first amendment imposes upon governmental efforts to limit advocacy. The Court has said,

[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action .... "[T]he mere abstract teaching ... of the moral propriety or even moral necessity for a resort to force

and violence, is not the same as preparing a group for violent action and steeling it to such action." ... A statute which fails to draw this distinction impermissibly intrudes upon the freedoms guaranteed by the First and Fourteenth Amendments. It sweeps within its condemnation speech which our Constitution has immunized from governmental control.

*Brandenburg v. Ohio,* 395 U.S. 444, 447–48, 89 S.Ct. 1827, 1829–30, 23 L.Ed.2d 430 (1969) (citations and footnote omitted) (quoting *Noto v. United States,* 367 U.S. 290, 297–98, 81 S.Ct. 1517, 1520–21, 6 L.Ed.2d 836 (1961)).

Moreover, the Court has made clear that the first amendment imposes strict limitations, not only upon governmental efforts to forbid political speech outright, but also upon governmental efforts to condition employment upon the exercise of political speech (at least where 'nonpolitical' jobs are at issue, *cf. Agromayor v. Colberg,* 738 F.2d 55, 60–61, (1st Cir.1984)). The Court has long since abandoned the view that an American "may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." *McAuliffe v. New Bedford,* 155 Mass. 216, 220, 29 N.E. 517, 517 (1892) (Holmes, J.). *See also Adler v. Board of Education,* 342 U.S. 485, 492, 72 S.Ct. 380, 384, 96 L.Ed. 517 (1952); *United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). Rather, the Constitution, as more recently interpreted, says that the government cannot put its citizens in a position where they can "avoid the risk of loss of employment ... only by restricting their [political] conduct to that which is unquestionably safe. Free speech may not be so inhibited." *Baggett v. Bullitt,* 377 U.S. at 372, 84 S.Ct. at 1322. *See, e.g., Torcaso v. Watkins,* 367 U.S. 488, 495–96, 81 S.Ct. 1680, 1683–84, 6 L.Ed.2d 982 (1961) ("that a person is not compelled to hold public office cannot possibly be an excuse for barring him from office by state-imposed criteria forbidden by the Constitution"); *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960) (examining conditions on state employment in light of first amendment standards developed in cases concerning direct governmental prohibitions). *See also Keyishian v. Board of Regents,* 385 U.S. at 597–602, 87 S.Ct. at 680–83 (applying *Brandenburg*-type standard to strike down loyalty requirement for state university employees); *Baggett v. Bullitt,* 377 U.S. at 366–70, 84 S.Ct. at 1319–21 (similar, with regard to oath required of state employees); *United States v. Robel,* 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967) (applying first amendment limits on direct prohibitions of associational activities to strike down federal limits on employment in defense plants); *Elfbrandt v. Russell,* 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966) (same with regard to state employment); *Cramp v. Board of Public Instruction, supra,* (same for public school teachers); *Stewart v. Washington,* 301 F.Supp. 610 (D.D.C.1969) (3-judge court) (per curiam) (striking down loyalty statute for federal employees, 5 U.S.C. § 7311, on *Brandenburg*-type grounds).

Finally, the Court has repeatedly held, in respect to employment as elsewhere, that government standards tending to inhibit speech must be clear and precise. "[P]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *United States v. Robel,* 389 U.S. at 265, 88 S.Ct. at 424 (quoting *NAACP v. Button,* 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963)). without precision, an inhibitory regulation may prevent speech far beyond the regulation's intent. As the Court has stated,

> [w]hen one must guess what conduct or utterance may lose him his position, one necessarily will "steer far wider of the unlawful zone...." *Speiser v. Randall,* 357 U.S. 513, 526 [78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460] ... The danger of that chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform [those affected] what is being proscribed.

*Keyishian v. Board of Regents,* 385 U.S. at 604, 87 S.Ct. at 684. *See Elfbrandt v.*

*Russell,* 384 U.S. at 18–19, 86 S.Ct. at 1241–42; *Baggett v. Bullitt, supra; Cramp v. Board of Public Instruction, supra.*

We do not see how the Order can be upheld in light of this case law. The Order aims directly at political "advocacy." And it does so in the broadest of terms. Its use of the phrase "advocacy of revolution" cannot be lawfully reconciled with *Baggett v. Bullitt, supra,* where the Court struck down an oath that foreswore advocating or furthering alteration of the form of government "by revolution, force, or violence," *id.* 377 U.S. at 362, 84 S.Ct. at 1317 (quoting Wash.Rev.Code § 9.81.010(5)). The Court there said,

> The ... oath goes beyond overthrow or alteration by force or violence. It extends to alteration by "revolution" which, unless wholly redundant and its ordinary meaning distorted, includes any rapid or fundamental change. Would, therefore, any organization or any person supporting, advocating or teaching peaceful but far-reaching constitutional amendments be engaged in subversive activity? Could one support the repeal of the Twenty-second Amendment or participation by this country in a world government?

377 U.S. at 370, 84 S.Ct. at 1321. The language of the Order also seems broader than that struck down by the Court in *Keyishian v. Board of Regents, supra.* The Court there found unlawful New York's statutory language forbidding state employment of one who "by word of mouth or writing wilfully and deliberately advocates, advises or teaches the doctrine that the government ... should be overthrown or overturned by force, violence or any unlawful means." 385 U.S. at 610, 87 S.Ct. at 687 (quoting § 105(1)(a) of New York Civil Service Law). The Court found that language unlawful because "mere advocacy of abstract doctrine is apparently included." *Id.* at 599–600, 87 S.Ct. at 681–82.

The *Keyishian* Court also held unconstitutional, because overbroad, New York's language covering "the utterance of any treasonable or seditious word or words or the doing of any treasonable or seditious act or acts," 385 U.S. at 612, 87 S.Ct. at 688 (quoting N.Y. Civil Service Law § 105(3)). The Order here is at least as broad, for it extends not only to "treason and sedition" but also to "advocacy thereof." Indeed, the concept of "advocacy of sedition" seems to radiate confusion. *See id.* at 598–99, 87 S.Ct. at 681 (if sedition includes advocacy of sedition, its scope "has virtually no limit"). The dictionary defines sedition in part as encompassing "speaking, writing, or acting against an established government." *Webster's Third New International Dictionary* 2054 (1976). Does the standard then apply to one who 'advocates speaking against the government'? One need not, however, rely on linguistic points. One need only examine this nation's practical, historical experience with the Sedition Act of 1798, 1 Stat. 596, to understand the radical threat to freedom that lurks in the use of the word "sedition." *See New York Times Co. v. Sullivan,* 376 U.S. at 273–76, 84 S.Ct. at 722–23. In sum, the language of the regulation is at least as broad, as vague, as inhibitory of legitimate political speech as language struck down in these other, Supreme Court, cases.

The government suggests three lines of argument aimed at distinguishing the Order from the provisions struck down in the cases we have cited.

■ First, the government points out that the Order may affect America's international relations, and it notes that the President's constitutional authority is greater when foreign, rather than purely domestic, affairs are at issue. *See, e.g., Regan v. Wald,* —— U.S. ——, 104 S.Ct. 3026, 3040, 82 L.Ed.2d 171 (1984) (quoting *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 319, 57 S.Ct. 216, 220, 81 L.Ed. 255 (1936)); *Dames & Moore v. Regan, supra.* We do not believe, however, that this factor can make the difference here. The appellee is a medical doctor. He is not a politician, a diplomat, or even an administrator. He does not want to represent the United States abroad, en-

gage in diplomacy, or practice politics. He seeks to work for an international organization that fights disease. His object—prolonging human life—is technical and scientific, not political. His employer is an international organization, not the American government. For these reasons, the executive's legitimate interest in an employee loyalty check in Dr. Ozonoff's case seems weaker, not stronger, than its interest in employment at a defense plant, *see United States v. Robel,* 389 U.S. at 263–64, 266–68, 88 S.Ct. at 424–25, in an educational institution, *see, e.g., Keyishian v. Board of Regents,* 385 U.S. at 602–03, 87 S.Ct. at 683, or for the federal government, *see, e.g., Cummings v. Hampton,* 485 F.2d 1153 (9th Cir.1973); *Stewart v. Washington, supra.* Indeed, even when foreign policy concerns are involved, there are limits to the President's power to grant or withhold rights to citizens—for example, passports may not be selectively denied on the basis of political belief or affiliation. *Regan v. Wald,* —— U.S. at ——, 104 S.Ct. at 3038. Here the government has failed to articulate any significant foreign policy concerns which are served by applying these overbroad standards to persons seeking positions at the World Health Organization. Giving full accord to the President's unique foreign policy role, the Executive still must bear some burden of justification when depriving citizens of basic free speech and associational rights. *See Baird v. State Bar of Arizona,* 401 U.S. at 6, 91 S.Ct. at 705. It has not met that burden here, for it has not identified any tangible harms that might occur to United States security or foreign policy concerns if persons such as Dr. Ozonoff are not subjected to sweeping, undirected inquiries of this type. At the least, the need for greater presidential authority stemming from the special demands of foreign relations would seem offset here by the diminished federal interest in investigating the speech activities of those who work for nongovernmental, humane, scientific or technical organizations abroad. If the President is forbidden to violate ordinary first amendment rules when citizens wish to travel abroad, *see Aptheker v. Secretary of State, supra,* or to work in sensitive positions at home, *see, e.g., United States v. Robel, supra; Schneider v. Smith,* 390 U.S. 17, 88 S.Ct. 682, 19 L.Ed.2d 799 (1968) (merchant marine), we do not see how he can do so in the case of a medical doctor wishing to work for an international scientific or technical organization.

Second, it points out that the Order does not *forbid* 'advocacy'; it does not require an oath not to engage in 'advocacy'; it does not even say that 'advocacy' *will* lead to loss of a WHO job. The Order says only that advocacy is a factor that *"may* be considered in connection with" a loyalty determination; and the resultant determination is simply forwarded to WHO for its use. We fail, however, to see how these features can distinguish this case from the loyalty oath cases. *See, e.g., Elfbrandt v. Russell, supra; Baggett v. Bullitt, supra; Cramp v. Board of Public Instruction, supra. Cf. Keyishian v. Board of Regents,* 385 U.S. at 596, 87 S.Ct. at 680 (state's decision to drop loyalty oath requirement and simply require employees' conformity to statutory loyalty standards does not alter first amendment analysis). The fatal flaw in the oaths was their tendency to deter legitimate speech activity through the threat of the loss of a job. Is that flaw not equally present here? Despite the Order's use of the word "may," a full reading of Part II of the Order indicates that the listed criteria are those likely to be taken into account in making the final loyalty determination. (See Appendix for full text of Part II.) The Order does not suggest, for example, that the listed 'criteria' are aimed only at producing 'leads' for further investigation; nor does it suggest any narrower standards by which the ultimate determination is to be made. *Cf. Konigsberg v. State Bar,* 366 U.S. 36, 46–47, 81 S.Ct. 997, 1004, 6 L.Ed.2d 105 (1961) (bar examiners can require applicant to answer over-broad question about Communist Party membership, where applicant is informed that question is merely preliminary to appropriately narrowed subsequent inquiry); *Law Students Civil Rights Research Council, Inc. v. Wadmond,* 401 U.S. at 164–66, 91 S.Ct. at 727–28 (similar).

Moreover, a finding of reasonable doubt as to loyalty would seem highly likely to foreclose a job offer; nothing in the record here suggests that international organizations routinely ignore the Secretary of State's loyalty appraisals. Thus, one who wants to work for WHO would reasonably read the list of criteria as telling him what conduct he must avoid. And, as previously pointed out, one who reads subsections (b) and (c) of Part II, ¶ 2 of this publicly promulgated Executive Order might well feel compelled to avoid perfectly legitimate speech activity—activity beyond what the government might legitimately investigate and perhaps even beyond whatever the government wants to consider.

Third, the government appears to suggest that the Order's language might be narrowed through interpretation, thereby making it consistent with Supreme Court precedent. We agree that it is important to seek a constitutional interpretation of the Order, to avoid reaching an unnecessary constitutional question. *See Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 348, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (citing *Crowell v. Benson*, 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932)). But, even if we indulge "every presumption of a narrow construction," we must do so in a manner "consistent ... with a proper respect for the English language." *Baggett v. Bullitt*, 377 U.S. at 372, 84 S.Ct. at 1322. Here, we see no obvious or natural interpretation of "advocacy" or "sedition" that would render the Order constitutional. Nor does the Order circumscribe the scope of these terms with modifiers or explanatory phrases or citations that might provide a toehold for a narrowing construction. *Compare Scales v. United States*, 367 U.S. 203, 221–23, 81 S.Ct. 1469, 1482–83, 6 L.Ed.2d 782 (1961) *with United States v. Robel*, 389 U.S. at 262, 88 S.Ct. at 422, *and Aptheker v. Secretary of State*, 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (1964). Nor has the government provided any suggestions for a permissibly narrow reading, beyond quoting the Supreme Court's discussions of the constitutional difference between advocacy in general and advocacy directed to imminent lawless action, discussions that identify the Order's problems, but do not resolve them.

There are other features of the Order which may also raise constitutional questions. *Compare, e.g.,* Order, Part II, ¶ 1 (articulating general standard of "whether ... there is a reasonable doubt as to the loyalty of the person involved to the Government of the United States") *with Law Students Civil Rights Research Council, Inc. v. Wadmond*, 401 U.S. at 162, 91 S.Ct. at 726 (discussing constitutional limits on placement of burdens of proof of loyalty); *and compare* Order, Part II, ¶ 2(a), (f) (covering, respectively, "knowingly associating with spies or saboteurs" and "adherence to and active participation in" certain subversive organizations) *with, e.g., Scales v. United States, supra, Noto v. United States, supra,* and *United States v. Robel*, 389 U.S. at 266, 88 S.Ct. at 424 (outlining constitutional limits on proscription of associations with subversive groups). But the provisions we have discussed above are sufficient for us to conclude that Executive Order No. 10422 is unlawful as applied to a WHO job applicant, and that the Executive Branch cannot require Dr. Ozonoff to submit to a loyalty investigation pursuant to the Order. The judgment of the district court is therefore

*Affirmed.*

### APPENDIX

### EXECUTIVE ORDER NO. 10422

Jan. 9, 1953, 18 F.R. 239, as amended by Ex.Ord.No. 10459, June 2, 1953, 18 F.R. 3183; Ex.Ord.No. 10763, Apr. 24, 1958, eff. July 1, 1958, 23 F.R. 2767; Ex.Ord.No. 11890, Dec. 10, 1975, 40 F.R. 57775; Ex.Ord.No. 12107, Dec. 28, 1978, 44 F.R. 1055

LOYALTY PROCEDURES FOR EMPLOYEES

PART I—INVESTIGATION OF UNITED STATES CITIZENS EMPLOYED OR BEING CONSIDERED FOR EMPLOYMENT ON THE SECRETARIAT OF THE UNITED NATIONS

1. Whenever the Secretary of State receives from the Secretary General of the

United Nations, the name of and other necessary identifying data concerning each United States citizen employed or being considered for employment by the United Nations, the Secretary of State shall, consistent with the Privacy Act of 1974 (5 U.S.C. 552a) [section 552a of Title 5, Government Organization and Employees] and other applicable law, cause an investigation to be conducted as provided in paragraph 2 of this Part, or forward the information received from the Secretary General to the Office of Personnel Management, which shall conduct an investigation, consistent with the Privacy Act of 1974 (5 U.S.C. 552a) [section 552a of Title 5, Government Organization and Employees] and other applicable law, as provided in paragraphs 3 and 4 of this Part.

2. With respect to all applicants for short term appointments which will not exceed six months and which are not appointments to United Nations Secretariat professional posts or posts subject to geographical distribution, the Secretary of State shall cause an investigation to be conducted, which investigation shall be limited to a search of the files of the Department of State. If the investigation reveals any derogatory information within the meaning of the standard set forth in Part II of this order, the information received from the Secretary General of the United Nations shall be forwarded to the Office of Personnel Management which shall conduct an investigation.

3. (a) Whenever the Office of Personnel Management receives the information forwarded by the Secretary General to the Secretary of State, the Office of Personnel Management shall conduct a National Agency Check. Each National Agency Check shall include reference to the following: (1) Federal Bureau of Investigation files; (2) Office of Personnel Management files; (3) Military Intelligence files as appropriate; and (4) files of any other appropriate Government investigative or intelligence agency.

(b) If the investigation conducted by the Office of Personnel Management reveals that a favorable National Agency Check was previously completed, and the investigation conducted by the Office of Personnel Management has not disclosed any derogatory information within the meaning of the standard set forth in Part II of this order, completion of a new National Agency Check is not required if: (1) the applicant is or was previously employed by the same or another international organization without an immediately prior break in such service exceeding one year; (2) the applicant is or was a United States Government civilian or military employee, or a United States Government contract employee, without an immediately prior break in such employment exceeding one year; or (3) the applicant is transferred or detailed from an agency of the United States Government pursuant to the provisions of sections 3343, 3581, 3582, 3583, or 3584 of Title 5 of the United States Code [sections 3343, 3581, 3582, 3583, or 3584 of Title 5, Government Organization and Employees].

4. Whenever information disclosed with respect to any person being investigated is derogatory, within the standard set forth in Part II of this order, the Office of Personnel Management shall forward such information to the Federal Bureau of Investigation, and the Bureau shall conduct a full field investigation of such person.

5. Reports of full field investigations shall be forwarded through the Office of Personnel Management to the International Organizations Employees Loyalty Board, established by Part IV of this order and hereinafter referred to as the Board. Whenever such a report contains derogatory information, under the standard set forth in Part II of this order, there shall be made available to the person in question the procedures of the Board provided or authorized by Part IV of this order (including the opportunity of a hearing) for inquiring into the loyalty of the person as a United States citizen in accordance with the standard set forth in Part II of this order. The Board shall transmit its determinations, as advisory opinions, together with the reasons therefor stated in as much

detail as the Board determines that security considerations permit, to the Secretary of State for transmission to the Secretary General of the United Nations for his use in exercising his rights and duties with respect to the personnel of the United Nations as set out in the Charter and in regulations and decisions of the competent organs of the United Nations.

6. At any stage during the investigation or Board proceeding, the Board may transmit to the Secretary of State, for forwarding to the Secretary General, in as much detail as the Board determines that security considerations permit, the derogatory information disclosed by investigation. This shall be for the purpose of assisting the Secretary General in determining whether or not he should take action with respect to the employee, or the person being considered for employment, prior to the completion of the procedures outlined in this order. The making available of any such information shall be without prejudice to the right of full hearing as provided for herein.

7. The Secretary of State shall notify the Secretary General in all cases in which no derogatory information has been developed.

### PART II—STANDARD

1. The standard to be used by the Board in making an advisory determination as provided for in paragraph 5 of Part I of this order with respect to a United States citizen who is an employee of, or is being considered for employment by the United Nations, shall be whether or not on all the evidence there is a reasonable doubt as to the loyalty of the person involved to the Government of the United States.

2. Activities and associations of a United States citizen who is an employee or being considered for employment by the United Nations which may be considered in connection with the determination whether or not on all the evidence there is a reasonable doubt as to the loyalty of the person involved to the Government of the United States may include one or more of the following:

(a) Sabotage, espionage, or attempts or preparations therefor, or knowingly associating with spies or saboteurs.

(b) Treason or sedition or advocacy thereof.

(c) Advocacy of revolution or force or violence to alter the constitutional form of government of the United States.

(d) Intentional, unauthorized disclosure to any person, under circumstances which may indicate disloyalty to the United States, of United States documents or United States information of a confidential or non-public character obtained by the person making the disclosure as a result of his previous employment by the Government of the United States or otherwise.

(e) Performing or attempting to perform his duties, or otherwise acting, while an employee of the United States Government during a previous period, so as to serve the interests of another government in preference to the interests of the United States.

(f) Knowing membership with the specific intent of furthering the aims of, or adherence to and active participation in, any foreign or domestic organization, association, movement, group or combination of persons, which unlawfully advocates or practices the commission of acts of force or violence to prevent others from exercising their rights under the Constitution or laws of the United States, or of any State, or which seeks to overthrow the Government of the United States or any State or subdivision thereof by unlawful means.

### PART III—OTHER INTERNATIONAL ORGANIZATIONS

The provisions of Parts I and II of this order shall be applicable to United States citizens who are employees of, or are being considered for employment by, other public international organizations of which the United States Government is a member, by arrangement between the executive head of the international organization concerned and the Secretary of State or other officer of the United States designated by the President.

PART IV—INTERNATIONAL ORGANIZATIONS
EMPLOYEES LOYALTY BOARD

1. There is hereby established in the Office of Personnel Management an International Organizations Employees Loyalty Board of not less than three impartial persons, the members of which shall be officers or employees of the Office.

2. The Board shall have authority in cases referred to it under this order to inquire into the loyalty to the Government of the United States of United States citizens employed, or considered for employment, by international organizations of which the United States is a member, and to make advisory determinations in such cases, under the standard set forth in Part II of this order, for transmission by the Secretary of State to the executive heads of the international organizations coming under the arrangements made pursuant to Parts I and III of this order.

3. The Board shall make necessary rules and regulations, not inconsistent with the provisions of this order, for the execution of its functions. There shall be included in such rules and regulations provisions for furnishing each person whose case is considered by the Board:

(a) A written statement of the alleged derogatory information, in as much detail as security considerations permit.

(b) An opportunity to answer or comment upon the statement of alleged derogatory information, in writing, and to submit affidavits.

(c) An opportunity for hearing before the Board, or a panel thereof of at least three members, including the right of the person to be represented by counsel, to present witnesses and other evidence in his behalf, and to cross-examine witnesses offered in support of the derogatory information: *Provided,* that the Board shall conduct its hearings in such manner as to protect from disclosure information affecting the national security.

4. Based upon all the evidence before it, including such confidential information as it may have in its possession, the Board shall make its determinations in writing, and shall send to each person who is the subject thereof a copy. In cases in which hearing or other action is by a panel of three members, the action or determination of the panel shall constitute the action or determination of the Board, except that rules and regulations pursuant to paragraph 3 of this Part shall be adopted by action of the Board as a whole.

5. Except as otherwise specified in this order, the Office of Personnel Management shall provide the necessary investigative and other services required by the Board. All agencies of the executive branch of the Government are authorized and directed to cooperate with the Board, and, to the extent permitted by law, to furnish the Board such information and assistance as it may require in the performance of its functions.

6. All cases arising under this order which are pending before the Regional Loyalty Boards and the Loyalty Review Board of the Office on the effective date of Executive Order No. 10450 of April 27, 1953, shall on that date be transferred to the Board.