William H. HINTON

v.

Donald J. DEVINE, et al.

Civ. A. No. 84–1130.

United States District Court, E.D. Pennsylvania.

April 8, 1986.

Henry Sawyer, III, Philadelphia, Pa., for plaintiff.

Victor Stone, U.S. Dept. Justice, Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

TROUTMAN, Senior District Judge.

In 1953 the President of the United States issued Executive Order No. 10422, providing for an investigation of United States citizens employed or being considered for employment by the United Nations or other international organizations. The Order establishes an International Organizations Employees Loyalty Board, the function of which is to evaluate all such citizens and render an advisory opinion as to their loyalty to the United States. That opinion is transmitted to the Secretary of State for ultimate transmittal to the executive head of the involved international organization. The opinion is developed in accordance with procedures described in the Order, and rules and regulations promulgated by the Board.[1] The plaintiff, William Hinton, a resident of Fleetwood, Pennsylvania, and a graduate of the Cornell College of Agriculture and the author of several books on China, challenges the constitutionality of Executive Order No. 10422.

In 1980 Hinton was hired by the Food and Agriculture Organization (FAO), an agency of the United Nations, to serve for six months as a consultant to the Grasslands Development Project in the Inner Mongolia Region of the Peoples Republic of China (PRC). Pursuant to Executive Order No. 10422, he requested and received a loyalty clearance. In 1981 and 1982 he received similar FAO offers of employment and again sought and received loyalty clearances. In 1983, having once again been advised that he was being considered for an FAO consultancy, Hinton, for his fourth consecutive year, requested a loyalty clearance. This time his clearance was unaccountably delayed. Having failed to receive a clearance for 1983, Hinton was not offered FAO employment, but did return to the project, on which he had served for the preceding three years, as an employee of the PRC.

Early in 1984, with another FAO offer allegedly on the horizon, Hinton filed the instant suit, contending that because his 1983 loyalty clearance request had not been processed for over a year, he lost an employment opportunity in 1983. More importantly, he feared that the lack of a clearance would adversely affect his expected 1984 FAO appointment. Accordingly, plaintiff filed a motion for a preliminary injunction, requesting that the Court direct immediate action on his pending application for a loyalty clearance. On April 5, 1984, after a March 28 conference before the Court, Hinton received a loyalty clearance, obviating the need for an immediate ruling on his request for a preliminary injunction. Thereafter, on June 26, 1984, plaintiff filed a motion for summary judgment seeking a declaratory judgment that Executive Order No. 10422 is unconstitutional and a permanent injunction against its further and continued enforcement.

Contending that plaintiff had received all the relief to which he was entitled when he was granted a loyalty clearance, the government responded with a motion to dismiss the complaint. Alternatively, it sought to postpone a substantive response to plaintiff's summary judgment motion pending discovery.

Ultimately, the Court held a hearing on defendant's outstanding motion to compel discovery, hoping to resolve what had become an impasse, *viz.*, the defendant's insistence that discovery was essential to the resolution of the case and plaintiff's equally adament insistence that only legal issues were involved and, hence, the government's discovery requests were interposed only to delay final judgment. The dispute was ultimately eliminated when plaintiff stated that he challenged the Order only on its

---

1. Executive Order No. 10422, as amended, is found at 22 U.S.C. § 287 note.

face and defendant dropped its discovery demands. Counsel and the Court then agreed upon a final briefing schedule and counsel stipulated to the documents that they considered relevant to the Court's decision. Thereafter, defendant filed its motion to dismiss or for summary judgment to which plaintiff replied. Defendant then responded to the reply, oral argument was held and the cross-motions are before the Court for disposition.

While these preliminary matters were being resolved, another challenge to the same Executive Order was decided by the Court of Appeals for the First Circuit. In *Ozonoff v. Berzak*, 744 F.2d 224 (1st Cir.1984), that court affirmed the decision of the district court for the District of Massachusetts, invalidating said Order. The Court of Appeals upheld the district court's determination that Ozonoff, a medical doctor who had once been investigated in connection with employment by the World Health Organization (WHO), had standing to challenge the constitutionality of the Order upon his representation that he would again seek WHO employment and wished to avoid the inconvenience and potential embarrassment of submitting to another loyalty investigation. The Court of Appeals also agreed with the district court's conclusion that the language of the Order is vague and overbroad, but did not reach the other basis for the lower court's decision, namely, that the President lacks the constitutional authority to promulgate such an Order. On that issue the Court of Appeals concluded that its decision as to the language of the Order disposed of the controversy without reaching the issue of Presidential authority. The court also limited its holding to WHO job applicants.[2] Understandably, the government argues vigorously that the *Ozonoff* case is not good law, is not binding upon this Court, and is not applicable to the facts of this case. The specific arguments raised by the government against the *Ozonoff* decision will be considered as we ultimately reach the issues involved.

We first consider the plaintiff's contentions that Executive Order No. 10422 is unconstitutional on its face as vague, overbroad,[3] a violation of procedural due process and that it exceeds the constitutional boundaries of Executive power. Defendant seeks dismissal of the complaint for lack of subject matter jurisdiction based upon lack of a case or controversey and lack of standing to sue. Alternatively, the government defends the Executive Order as a valid exercise of the President's Article II powers over foreign affairs, disputes each of plaintiff's claimed constitutional deficiencies and thus also seeks summary judgment.

I. *Existence or lack of a case or controversy and standing*

At the outset it is necessary to delineate the issues with respect to standing and whether a case or controversy exists.[4] The government contends that, because plaintiff has been granted the loyalty clearance he sought at the time this action was filed, he must now establish that he continues to

---

**2.** The court's conclusion that, "Executive Order No. 10422 is unlawful as applied to a WHO job applicant, and that the Executive Branch cannot require Dr. Ozonoff to submit to a loyalty investigation pursuant to the Order", 744 F.2d at 234, is somewhat puzzling in that the court's analysis seems to indicate that there is no proper application of the Order, *i.e.*, that it is substantially overbroad and facially vague in its entirety, yet the court purports to limit its holding to Dr. Ozonoff and other WHO job applications.

**3.** The overbreadth claim was not specifically raised in the complaint or amended complaint but has been sufficiently briefed and argued by both parties to merit the Court's consideration.

Moreover, at the hearing on defendant's motion to compel discovery, plaintiff asserted, without objection, that he was challenging the Order as both vague and overbroad.

**4.** In raising the question whether a case or controversy exists, defendant is actually challenging plaintiff's Article III standing. *Secretary of State of Maryland v. Munson*, 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984). Thus, we treat defendant's separate arguments that there is no presently existing case or controversy and that plaintiff lacks standing as challenges to plaintiff's standing on both constitutional and prudential grounds.

have standing. Moreover, the government contends that he can do so only by demonstrating that he has a current employment offer from the FAO or another international organization for which he is once again seeking a loyalty clearance.[5]

[1] We first determine whether plaintiff's receipt of the loyalty clearance he sought at the outset, coupled with his lack of an outstanding employment offer, vitiates the primary element of Article III standing, *i.e.*, that the plaintiff must have suffered a real or threatened injury. *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). If standing is found to exist in the constitutional sense, we next determine whether,

as a prudential matter, the Court should allow the plaintiff to pursue these claims under the circumstances. *Id.*

■ It is undisputed that Hinton was employed by the FAO in 1980, 1981, 1982 and 1984, and that he was at least considered for an appointment in 1983, but was not employed by any international agency. He did not receive a loyalty clearance in 1983. It is certainly reasonable to infer that there was a cause and effect relationship between his failure to obtain a loyalty clearance and his failure to be employed by the FAO in 1983. This inference is supported by a letter that Hinton received from Ralph Nicolosi of the FAO advising him that the FAO could not make final arrangements for his appointment absent a report pursuant to Executive Order No. 10422.[6] (Plaintiff's Exhibit # 69).

---

5. To buttress this argument, the defendant also contends that the plaintiff is foreclosed from coming forward with proof of such an offer, if it exists, because the record is closed and because plaintiff has limited his challenge to the facial validity of the Executive Order and stipulated that only those documents that the government agrees are relevant and admissable are part of the record.

To the extent that this line of argument suggests that the Court is thereby required to decide this case in the abstract, it also suggests that defendant may be harboring a fundamental misconception as to the meaning of a facial challenge in general as well as the import of the stipulated record in this case.

In the context of a challenge on grounds of overbreadth, a facial challenge rather than a challenge "as applied" simply means that even one, "whose own speech or expressive conduct may validly be prohibited or sanctioned is permitted to challenge a statute on its face because it also threatens others not before the court". *Brockett v. Spokane Arcades*, 472 U.S. ——, ——, 105 S.Ct. 2794, 2801–02, 86 L.Ed.2d 394, 405 (1985). Therefore, asserting a facial overbreadth challenge goes entirely to the question of plaintiff's standing in a prudential sense and to that extent lessens plaintiff's burden.

A facial challenge on the ground of vagueness, on the other hand, is in a somewhat different posture. In that context, "... the litigant must demonstrate that the statute under attack is vague as applied to his own conduct regardless of its potentially vague application to others". *Aiello v. City of Wilmington, Delaware*, 623 F.2d 845, 850 (3d Cir.1980). Here, although phrased in terms of standing, a facial challenge essentially goes to what the plaintiff must show to

prevail on the merits, *i.e.*, that his own protected conduct is in danger of being chilled because the regulation lacks clarity and specificity and hence may be applied unconstitutionally to him as well as to others.

For this reason, it is never possible to consider a facial challenge in a vacuum, without reference to what has actually transpired in a given case.

Thus, plaintiff's statement that he is mounting a facial challenge only does not preclude the Court, as defendant seems to suggest, from determining that the Order was unlawfully applied to him, if we do so upon the record which we have agreed to consider. We interpret plaintiff's statement as to the nature of his challenge as reflecting his belief that our examination of the language of the Order will compel the conclusion that it is substantially overbroad, as well as vague, and so must be invalidated in its entirety. As such, it is a matter of argument and vigorous advocacy.

By the same token, defendant's denial that plaintiff can establish his standing, much less demonstrate the complete invalidity of the Order, is likewise a matter of argument. The Court's decision on the merits will determine the extent, if any, of the Order's illegality.

6. This also undercuts the government's assertion that because the report is advisory only, international organizations are free to hire any United States citizen regardless of the outcome of the loyalty investigation process.

While this may be a fact, it is apparent that the FAO, at least, considers itself bound not to hire a United States citizen until the process is complete, no matter what action it might take if an adverse recommendation were received.

Hinton's loss of an employment opportunity in 1983 certainly qualifies as an injury in fact, notwithstanding his ability to obtain alternative employment for that year.[7] It is not necessary that a plaintiff be continuously and unremittingly affected by another's unlawful conduct, from its occurrence through the conclusion of a lawsuit brought as a result of it, to maintain his standing.

Moreover, the kind of threatened injury also sufficient to establish standing still exists here. Given the plaintiff's employment history since 1980, it is reasonable to assume that he will again seek employment with the FAO and again require a loyalty clearance. It is not essential, to establish standing on this basis, for him to pinpoint exactly when this might occur. *Ozonoff, supra.* It is important to note, with respect to the concept of threatened injury as it appears in this case, that the plaintiff is not complaining of the possibility that he will not receive a favorable recommendation upon future applications for a loyalty clearance under the Order. Rather, as in the *Ozonoff* case, the gravamen of his complaint is that he should not be subjected to the process of seeking a loyalty clearance because that in itself carries a threat of potential injury. The facts of this case demonstrate in the clearest possible terms that such a claim is not speculative. Although routinely approved for several years, plaintiff was inexplicably subjected to a delay of some twenty months in connection with his last application. Thus, it is evident that past clearances are no guarantee of prompt or expedited future clearances. With this history, it is entirely possible that Hinton may become a less attractive employment prospect in his chosen field if the FAO or other agency suspects that his clearances may continue to require an exceptionally long time to process. These concerns are in addition to plaintiff's basic claim that the Order itself subjects him to the potential harm of having his activities investigated in violation of basic First and Fifth Amendment rights. This plaintiff is arguably more likely than most citizens to suffer that harm, if found to exist, given the likelihood of his continuing to seek FAO employment.

A secondary Article III concern is also easily satisfied by the facts of this case. The Court is here presented with a controversy between two parties that are, in the Supreme Court's terms, "classically adverse", *Singleton v. Wulff,* 428 U.S. at 113, 96 S.Ct. at 2873, meaning that the Court's decision will result in a clear benefit to the prevailing party and the concomitant loss of a vigorously defended prerogative by the losing side. Indeed, the present controversy is a paradigm of the historical tension, endemic to this nation, between the necessity for, and proper boundaries of, government regulation and the precious rights of free expression and due process guaranteed to the citizenry.

In addition to the determinative Article III standing requirements, absent which the Court may not properly consider a case, certain prudential considerations must also be addressed. To meet these requirements, a plaintiff must generally assert his own legal rights and interests, so that the issues will be clear and precise and so that the courts do not engage in premature or unnecessary statutory construction or con-

---

Other portions of the record further weaken the defendant's position on this issue. In defendant's Exhibit H to its memorandum in support of Motion to Dismiss/Cross Motion for Summary Judgment, Doc. #36, testimony before the Committee on Appropriations of the House of Representatives was reproduced. In considering appropriations for Independent Offices for fiscal year 1964 (p. 174), the testimony revealed that the United Nations does *not* place United States citizens on its payroll until loyalty investigations are completed. Moreover, the testimony revealed that although, as of 1963, only one person was dismissed on loyalty grounds, "In many instances they determine not to select for that particular reason. This means that we are providing additional information". The foregoing statement also implicates due process concerns and supports the Court's conclusion on that issue, discussed at length, *infra.*

7. The fact that plaintiff returned to the Grasslands project in 1983 as an employee of the PRC is relevant only to the question of damages, no longer an issue in this case.

stitutional adjudication. *Secretary of State of Maryland v. Munson,* 467 U.S. 947, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984). Prudential standing concerns will be relaxed in some situations, particularly where a facial First Amendment overbreadth challenge has been made. *Singleton v. Wulff, supra.* This is necessary because the danger of chilling free speech and other protected activities by allowing the enforcement of an overly broad law or order overcomes the Court's proper reluctance to engage in constitutional adjudication. *Id.* A challenge on facial overbreadth grounds is allowed primarily to benefit society generally, *i.e.,* "to prevent the statute from chilling the First Amendment rights of other parties not before the court". *Maryland v. Munson,* 467 U.S. at 958, 104 S.Ct. 2848, 81 L.Ed.2d at 796. In these situations the prudential standing requirements are framed in terms of whether the plaintiff before the Court is the most effective advocate of the rights he seeks to champion. *Singleton v. Wulff, supra.* In other words, the Court is primarily concerned with whether the plaintiff can be expected to satisfactorily frame the issues in the case. *Maryland v. Munson,* 467 U.S. at 958, 104 S.Ct. at 2848, 81 L.Ed.2d at 797. This is not to say that the Court is precluded from determining that the plaintiff who raises an overbreadth claim is one of "those who desire to engage in protected speech that the overbroad statute purports to punish", *Brockett v. Spokane Arcades, Inc.,* 472 U.S. ——, ——, 105 S.Ct. 2794, 2802, 86 L.Ed.2d 394, 406 (1985), and thus meets the normal standing rules. In other words, third-party standing is not required, merely allowed in this context.

Although the standing requirements for pursuing a claim that a challenged law is void for vagueness are those normally considered necessary, *i.e.,* the plaintiff must "show that his claim falls within the 'zone of interests to be protected or regulated by the statute or constitutional guarantee in question;'", *Ozonoff, supra,* at 227 (quoting *Valley Forge Christian College,* 454 U.S. at 475, 102 S.Ct. at 760), that is not a problem in this case. Notwithstanding the defendant's arguments to the contrary, it is by no means clear that Hinton's conduct which may have been investigated pursuant to the Executive Order "clearly falls within the permissible purview" of the Order, *Aiello v. City of Wilmington, Delaware,* 623 F.2d 845, 850 (3d Cir.1980), the only circumstance under which the plaintiff would not be permitted to proceed in light of his complaint that the vagueness of the Order impermissably curtails his First and Fifth Amendment rights.

■ Thus, it is evident that the plaintiff in this case can withstand the most stringent application of prudential standing principles. The Executive Order he challenges has been applied to him several times in the past and he is more likely than most to encounter it in the future. Moreover, he has engaged in political speech over a period of years [8] which is arguably protected and which he contends was the basis for the lengthy delay in processing his 1983 loyalty clearance.[9] Consequently, although he is entitled to the application of more lenient standing requirements because he has challenged the Order as substantially overbroad on its face, Hinton does not need to rely on those *jus tertii* principles. However, even if we were to conclude that he lacked standing on any other basis, Hinton would still be permitted to maintain his suit and challenge the order on facial overbreadth grounds upon the Court's conclusion that he is an effective and interested challenger to the Order he seeks to have overturned. It is abundantly clear that plaintiff easily fulfills that re-

---

**8.** The government not only admits that this is true, but, in part, bases its arguments that plaintiff lacks standing to challenge the Order on this fact. See, Defendant's Brief in Support of Motion to Dismiss/Cross Motion for Summary Judge, Doc. # 36, at 13, 14.

**9.** The Court recognizes that the true reason for the delay is in dispute. However, for purposes of defendant's motion to dismiss for lack of standing, all that the Court is considering at this point, we take plaintiff's allegations as true. *Scheuer v. Rhoades,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

quirement and enjoys standing to litigate a case or controversy which we find and conclude exists.

## II. *Lack of Presidential Authority*

We now consider the plaintiff's contention that the authority and power of the President over foreign affairs does not extend to regulating the employment of United States citizens by international organizations. The government contends that the breadth of authority over foreign affairs conferred by Article II of the Constitution, combined with Congress's acquiescence in the loyalty clearance program and its purported support by the United Nations, is sufficient to establish the legitimacy of Executive Order 10422.

In *Ozonoff*, the First Circuit declined to reach the issue of presidential authority and power although it had been considered and decided in favor of the plaintiff by the district court.

We agree with the principles that implicitly motivated the First Circuit's decision not to address this issue. These are the sound and longstanding concerns that govern constitutional adjudication, *viz.*, to decide constitutional issues on the narrowest grounds possible and to refrain from "anticipat[ing] [a] question of constitutional law in advance of the necessity of deciding it". *Burton v. United States*, 196 U.S. 283, 25 S.Ct. 243, 49 L.Ed. 482, *Brockett v. Spokane Arcades, supra.*, 472 U.S. at ——, 105 S.Ct. at 2800–01, 86 L.Ed.2d at 404. For these reasons, we too decline to decide the issue of Presidential power and authority in this case. It is unnecessary to test the outer bounds of the President's power over foreign affairs in this case.

The heart of the matter here is not whether, under any conceivable circumstances, the President lacks all authority to regulate or oversee in any manner the employment of United States citizens by international organizations. The true issue presented for our consideration is whether the loyalty clearance program, as presently operating, is a valid exercise of whatever power the President may have in this area.

This requires the Court to determine whether there is a sufficiently developed and articulated governmental interest to support investigations into the loyalty of United States citizens employed or being considered for employment by international organizations and whether the methods chosen to vindicate that interest, if it exists, show proper regard for safeguarding other constitutional interests.

## III. *Overbreadth/Vagueness*

The analysis involved when a law is challenged as overbroad is somewhat different from that required when the same law is challenged as vague, but a statute that fails constitutional scrutiny on either ground suffers from the same basic infirmity, *i.e.*, the danger that in seeking to avoid the sanctions imposed by the law, an individual's legitimate exercise of First Amendment rights may be "chilled". *Keyishian v. Board of Regents of New York*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), *Secretary of State of Maryland v. Munson, supra.*

▆▆▆ For the plaintiff to prevail on a claim that a law is unconstitutionally vague, the Court must conclude that the challenged law fails to give fair notice of its proscriptions or requirements. Thus, "... men of common intelligence must necessarily guess as (sic) its meaning and differ as to its application". *Aiello v. City of Wilmington, supra*, at 850 (citing *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926).) A determination that a law is overbroad is generally expressed in terms of its impermissibly sweeping into its proscriptions conduct that is legitimate as well as conduct which may properly be regulated. *United States v. Robel*, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967). When a facial overbreadth challenge has been made and standing is based upon *jus tertii* principles, the plaintiff can prevail only when the overbreadth is "substantial", because in such a case, "the law may not be enforced against anyone". *Brockett v. Spokane Arcades*, 472 U.S. at ——, 105 S.Ct.

at 2802, 86 L.Ed.2d at 406. On the other hand, if the plaintiff has standing to challenge the law in the usual sense of the term, *i.e.*, he complains that the law has reached his own protected conduct, "[t]he statute may forthwith be declared invalid to the extent it reaches too far, but otherwise left intact". *Id.* It is always possible, of course, that even where the latter standard applies, the Court may find a law substantially overbroad in its entirety.

■ In addition to these specific principles, there are two more general principles to be applied when a law is challenged as either vague or overbroad. First, the government's interest in regulating the proscribed conduct must be at least important, if not substantial and compelling. *See, e.g. Broadrick v. Oklahoma*, 413 U.S. 601, 611, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830, 839 (1973): "... statutes attempting to restrict or burden the exercise of First Amendment rights ... must represent a considered legislative judgment that a particular mode of expression has to give way to other compelling needs of society". (Citations omitted). Second, the law must be tailored to vindicate the government's articulated interest with as little burdening of First Amendment rights as possible. The Supreme Court has reiterated a fundamental rule in this regard time and again: "Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms". *NAACP v. Button*, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405, 421 (1963), quoted in *Keyishian, supra*, 385 U.S. at 604, 87 S.Ct. at 684, *United States v. Robel*, 389 U.S. at 265, 88 S.Ct. at 424. In summary, any law that touches protected rights must be narrowly drawn to define and punish or regulate specific conduct found to constitute a clear and present danger to a substantial government interest. *Elfbrandt v. Russell*, 384 U.S. 11, 18, 86 S.Ct. 1238, 16 L.Ed.2d 321, 326 (1966). A corollary that may logically be derived from this basic tenet is that the

more First Amendment rights are likely to be involved, the more compelling and substantial the governmental interest must be to support regulation. Moreover, if the government's articulated interest is found to be unclear or unimportant, the challenged regulation cannot stand unless the Court concludes that it does not, in fact, burden First Amendment rights. Thus, our task in this case is to examine the breadth and specificity of Executive Order 10422 in light of the interests purportedly at stake.

The *Ozonoff* court, faced with precisely the same burden began this undertaking with the observation that "[t]he Order aims directly at political 'advocacy'. And it does so in the broadest possible terms". 744 F.2d at 232. After comparing some of the terms of the Order to similar requirements imposed by various levels of government and found by the Supreme Court to be either vague or overbroad in their sweep, the *Ozonoff* court concluded that, "... the language of the regulation is at least as broad, as vague, as inhibitory of legitimate political speech as language struck down in these other, Supreme Court cases". *Id.*[11]

Notwithstanding the government's vigorous arguments to the contrary, our own analysis of the language of Executive Order 10422 compels the same conclusion. First Amendment rights are certainly implicated. Likewise, we agree that the language found objectionable by the First Circuit is both vague and overbroad in its sweep. However, that court selected certain examples of the Order's language, limited to activities subsumed under the term "advocacy", as particularly objectionable. From this the government argues that only those parts of the Order cannot withstand scrutiny. Thus, while certainly not agreeing with the *Ozonoff* court's analysis in any respect, the government nevertheless argues that should this Court agree with the First Circuit's conclusions, we should either interpret the objectionable phrases in

---

11. In this part of its analysis of Executive Order No. 10422, the First Circuit relied upon *Baggett v. Bullitt*, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964) and *Keyishian v. Board of Regents, supra*.

a way that would render them lawful or sever them, leaving the rest of the Order intact.

Although, as contended, we could narrow the sweep of the Order, to do so in this case would require that we virtually rewrite it, which is not a task that any court should undertake. *Stewart v. Washington*, 301 F.Supp. 610 (D.C.1969). Moreover, we believe that this line of argument on the defendant's part misconstrues the import of the *Ozonoff* decision. As we read it, the court did not mean to say that only those phrases selected as obvious exemplars of unconstitutional language were objectionable. Lest the same arguments be made with respect to the ultimate conclusions reached by this Court, we propose to demonstrate that no part of the Order is enforceable as written and that the government's interest is neither sufficiently important nor sufficiently clear to warrant a loyalty program of this type.[12]

 Part I of the Order deals with the nature and extent of the investigation to be conducted into the activities of any United States citizen employed by or seeking employment with an international organization.[13] The investigation begins with a search of State Department files for "derogatory information". If any is found, the investigation proceeds to the Office of Personnel Management for a National Agency check, involving a search of more files for "derogatory information". For this second phase of the investigation, the files of certain agencies must be included but those of any other "appropriate" agency may also be included, thereby expanding the search to virtually all government investigative or intelligence agencies at the unfettered discretion of the person compiling the relevant information. If this phase

reveals "derogatory information", the matter is referred to the FBI for a full field investigation.

If that investigation reveals "derogatory information", the due process procedures of Part IV of the Order are triggered. Importantly, Part I 6 of the Order empowers the IOELB, through the Secretary of State, to inform the Secretary General of the United Nations or the director of any other international organization of whatever "derogatory information" may have been discovered at any stage of the proceeding *without* invoking the due process provisions.

If the investigation outlined above discloses no "derogatory information", the Secretary of State will so advise the Secretary General or international agency director. Otherwise, the IOELB renders an advisory opinion to the Secretary of State as to the loyalty of the person investigated on the basis of the information compiled as a result of the investigation. The Secretary of State then transmits the Board's recommendation to the head of the international organization.

Throughout Part I, wherever the term "derogatory information" appears it is accompanied by the phrase, "within the meaning of the standard set forth in Part II of this order". Nowhere in Part II does the term "derogatory information" appear, however. Instead, the "standard" is defined in Part II 1 as, "whether or not on all the evidence there is a reasonable doubt as to the loyalty of the person involved to the Government of the United States". The "derogatory information", which presumably will become part of that evidence, remains undefined, as does the term "loyalty". Part II 2 provides a list of "activities and associations ... which may be con-

---

12. The *Ozonoff* court reached the same conclusion with respect to the nature and importance of the government's interest, noting that the government, "failed to articulate any significant foreign policy concerns which are served by applying these overbroad standards" to persons employed by or seeking employment with international organizations rather than by the government itself. 744 F.2d at 233.

13. More precisely, Part I applies only to the United Nations but Part III extends the provisions of the Order to employees or prospective employees of any other international organization of which the United States is a member.

sidered" in determining whether or not there exists a reasonable doubt as to the person's loyalty. Engaging in any of the enumerated activities is presumably evidence of disloyalty or at least can raise a reasonable doubt as to loyalty. In any event, engaging in such activities would appear to be the sort of "derogatory information" that would be revealed in a check of the various files which may be perused in the search for such information.

It should be readily apparent from the Court's having to guess at the meaning of the terms in Part II that the purported standard fails to give fair notice to a person targeted for investigation of what conduct or activity may trigger a reasonable doubt as to his "loyalty" in the minds of those examining whatever files the investigators choose to select. Moreover, the problem is further complicated by the pervasive use of the term "may". The enumerated activities "may" be considered and the specific list of activities and associations "may" include those enumerated. The use of the term "may" indicates that the "derogatory information" which could be adduced through the investigation is not limited to the listed activities and associations.[14] It is left to the investigator to define "derogatory information" and decide whether it raises a reasonable doubt as to the target's loyalty. It is difficult to imagine a regulation more vague or more capable of overbreadth in its application. It is akin to a law proscribing the undefined term "bad acts", leaving to those charged with enforcing the law the responsibility to define, interpret and apply that term on an *ad hoc* basis.

In addition to an incomprehensible "standard" which could conceivably be applied differently by different investigators each time it is invoked, Part II 2 of the Order purportedly provides some guidance as to the kinds of activities the Board "may" consider in rendering its loyalty opinion,

each of which is itself vague, overbroad or both.

Part II 2 (a) and (f) concern associations both informal and formal, including, "knowingly associating with spies or saboteurs" and "[k]nowing membership with the specific intent of furthering the aims of, or adherence to and active participation in", virtually any "combination" of persons who advocate the use of violence to overthrow the Government of the United States or any state or political subdivision thereof.

As written, these portions of the Order violate the well-known proscription against taking adverse action, particularly employment related action, against an individual in connection with his associations unless the law is clearly limited only to the individual's adherence to the unlawful aims of such associates. *Elfbrandt v. Russell, supra, Keyishian v. Board of Regents, supra, United States v. Robel, supra.* A regulation, such as this Order, which is not so limited, sweeps into its purview, "associational activity which can be constitutionally punished and membership which cannot be so proscribed". *United States v. Robel,* 389 U.S. at 266, 88 S.Ct. at 425. In *Robel,* the Supreme Court recognized that organizations often have multiple purposes, some of which may be legal although others are not. Adherence to the legal aims of such groups may not be sanctioned. Thus, these portions of the Executive Order, which fail to make that important distinction, are overbroad.

Even the proscription against "sabotage, espionage or attempts or preparations therefor" found in Part II 2 (a) are not sufficiently clear to survive constitutional scrutiny, as they are not limited to criminal convictions for such activities. Without that limitation, the terms are unconstitutionally vague.

It is unnecessary for this Court to engage in a prolonged analysis of the activities enumerated in Part II 2(b) and (c). The activities described therein which may sub-

14. The defendant admits that this interpretation is correct. See, Defendant's Memorandum in Support of Motion to Dismiss/Cross Motion for

Summary Judgment, Doc. # 34 at 61: "This list of relevant Executive Order 10422 activities is not meant to be all inclusive".

**1034**

ject an individual to sanctions are the advocacy activities chosen by the *Ozonoff* court as prime examples of the Order's overbreadth. The First Circuit's conclusions, with which we agree, do not require further elaboration.

Part II 2(d) deals with the disclosure of confidential or other non-public information obtained while employed by the United States or "otherwise" to any person "under circumstances which may indicate disloyalty to the United States". The terms "information" and "documents" are not defined or limited except in terms of "disloyalty", also undefined. It is impossible to determine whether disloyalty in this portion of the Order means the absence of "loyalty", as defined in the standard found in Part II 1. If so, it is inconceivable that such disclosure would not raise a reasonable doubt as to "loyalty", yet this activity is merely one among many which "may" be considered in determining whether there is a reasonable doubt as to an individual's loyalty. Logically, then, "disloyalty" as used in this portion of the Order seems to indicate something less than the opposite of "loyalty" as that term is used in other portions of the Order, specifically in defining the general standard to be applied. This terminology is another example of language in the Order which, in the First Circuit's words, "seems to radiate confusion". *Ozonoff* at 232.

In addition to being vague, this portion of the Order is also substantially overbroad. "Disloyalty" can conceivably be considered as anything that would tend to embarrass the United States. That, in turn, could be defined or considered in terms of embarrassing certain officials thereof. Conceivably, the reach of the behavior which may be swept into this category of "derogatory information" could extend to the disclosure by a Member of Congress of illegal or unethical practices in connection with government contracts while preparing to ultimately propose legislation to correct the problem. Although immune from prosecution and civil suit for such activities, he or she would not be immune from some anonymous investiga-

tor's belief or opinion that such an activity indicates "disloyalty". While this may seem to be an extreme example, it serves to illustrate the problems inherent in undefined terms in a regulation that can be applied in a purely discretionary manner.

Part II 2(e) is likewise vague and capable of overbroad application. The activity which may presumably be considered an example of "derogatory information" under this section is "Acting while an employee of the United States ... so as to serve the interests of another government in preference to the interests of the United States". The activities thus subject to inclusion in the files as "derogatory information" are limited only by the imagination of those capable of placing information in such files and the evaluator of the information therein. Worse, those activities may relate to a "previous period" of employment, a period of time in the past, when a youthful evaluator has no knowledge of then existing conditions and governmental relationships. It is conceivable, for example, that this section could overreach and cover or consider policy disagreements within the State Department itself as to the best course to follow with respect to any nation or with respect to a specific nation at a particular time in the past. An employee who finds himself within the losing faction in such a dispute could some day discover that his position was misinterpreted as an attempt to perform his duties so as to advance the interests of another nation and so placed in the files of some investigative agency. It must be remembered that loyalties, allegiances and supporting or unsupporting relationships between nations change from time to time and over a period of time. An individual's present loyalty or disloyalty to his own country may be radically misjudged in the future if the relationships between his country and another have radically changed and he is being judged in the light of subsequent and radically different circumstances.

■ The Order's deficiencies as to vagueness and overbreadth are further

compounded by its failure to mandate that any information, relied upon to determine either the ultimate advisory opinion or the scope of the investigation, be checked for accuracy. Moreover, despite the lack of such a limitation, the Order permits the Office of Personnel Management to communicate any information that it considers "derogatory" to the Secretary of State for transmittal to the international organization at any stage of the investigation, without notice to the person whose loyalty is being assessed and certainly without affording the person concerned an opportunity to explain or refute such information.

Thus, depending upon the timing of the action taken, Part I 6 of the Order renders the due process provisions of Part IV a sham at the outset. Even if the person under investigation is afforded the notice and hearing set forth in Part IV, and satisfactorily refutes the information disclosed to him at that point, it may have already been passed along to his employer or prospective employer and have adversely affected his employment. Moreover, the Board also has the unfettered discretion to withhold any information in its possession, and upon which it may rely in making its advisory recommendation, from the individual concerned if it is deemed to affect "national security", also an undefined term. These limitations on procedural due process are inconsistent with the protections afforded a person caught in the act of committing the most heinous crime and yet may be applied to citizens whose activities do not even approach illegality simply because they seek to be employed by an international organization.

Those persons investigated under the Order may never be told how extensive was the investigation or what, if any, "derogatory information" surfaced in the course of the investigation. Thus, they can never be certain that the National Agency check described in Part I 3(a) of the Order will not be conducted repeatedly even if they fulfill all the other requirements of Part I 3(b), which limit the scope of some subsequent investigations but only if no "derogatory information" was disclosed during prior in-vestigations. Consequently, even the receipt of a favorable advisory opinion as to loyalty is no guarantee that an extensive investigation will not be mounted each time a loyalty clearance is requested, even if, as in Hinton's case, such requests are made several years in succession. This, coupled with a "standard" completely devoid of certainty and the purely discretionary nature of its application, provides ample reason for any individual subject to its provisions to complain of the Order's investigative process no matter what the ultimate outcome. The process may unwittingly, unintentionally and even innocently be used to delay the employment of United States citizens on the basis of their exercise of First Amendment rights of association and free speech. Worse, the process may be used to harass an applicant or subject for engaging in protected conduct.

■ Since Hinton received a loyalty clearance that did not disclose the extent of the investigation to which he was subjected, whether "derogatory information" was discovered and/or disclosed to the Secretary of State and then transmitted to the Secretary General, we conclude that he was denied due process of law in connection with his latest loyalty clearance notwithstanding the determination that there was "no adverse recommendation to transmit". (Reproduced as Defendant's Exhibit E to Doc. # 36).

Next, we address defendant's arguments that the Order must be read in the light of specific Supreme Court precedent and definition, meaning that this Court should hold that any language in the Order found to be vague or overbroad must be construed and applied in accordance with approved Supreme Court interpretations of it. Thus, for example, the government invites the Court to read the term "advocacy" as "advocacy directed to imminent lawless actions", a kind of advocacy which may be proscribed under the rule of *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969), (quoted in Defendant's Memorandum in Support of its Motion to

Dismiss/Cross-Motion for Summary Judgment, Doc. # 36 at 65).

Even if such a course were feasible in light of our conclusions as to each part of the Order, it finds no support in the case law that this Court has examined in the course of deciding the issues presented here, and indeed is precluded by the defendant's own arguments, marshalled to convince the Court of the legality of the Executive Order.

In the first instance, applying a "limiting construction" is inappropriate in this context. Such a course is usually followed where a reviewing court, to avoid facial invalidation of a statute, looks to the construction and application of the challenged language by a lower court or an authoritative state court. *NAACP v. Button, supra, Ferguson v. Estelle,* 718 F.2d 730 (5th Cir.1983). Where a criminal statute is involved, the reviewing court looks to the elements of the crime, as defined and applied by the trial court, in deciding whether the challenged proscriptions are vague or overbroad. *Scales v. United States,* 367 U.S. 203, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961). However, where there has been no prior construction of the terms of a challenged statute or regulation, the Supreme Court has refused to rewrite it in order to make it conform to the Constitution, holding that such is the function of the legislating body. *See, e.g., United States v. Robel, supra.* Moreover, in its brief, the government has explicitly recognized that the responsibility for the revision of laws found vague or overbroad rests with the author of the legislation. See, Defendant's Memorandum, Doc. # 36 at 59, n. 38.

In short, the *sine qua non* of any court's applying a "limiting construction" is some authoritative interpretation and example of how a challenged regulation has been ap-

plied. In this case, the record is devoid of such general guidance.[15] The Court can only look to the arguments and exhibits produced in this case. From these, we receive the unmistakable and disquieting impression that the government seeks to justify investigating applicants for employment with international organizations on the basis of political speech and other instances of protected conduct both with respect to Hinton and in general.[16]

The foregoing analysis should also serve as a complete response to the government's contention that the Court should sever those parts of the Order found to be unconstitutional. There is simply nothing left that may lawfully be enforced. Although we have declined to hold that the President has absolutely no power to set any standards in connection with the employment of United States citizens by international organizations, this Executive Order is not a proper exercise of whatever power he may have in that regard. Having so concluded, it is futile to weigh the Order against the government's stated interest in retaining the loyalty clearance program. That, however, is an essential part of the analysis when a law is held to be unconstitutionally vague or overbroad.

## IV. *Nature of the Government's Interest*

We begin this phase of the analysis by examining the government's stated interest as set forth in § [6] of the Preamble to Executive Order No. 10422:

"... it is in the interest of the United States that United States citizens who are employees of the Secretariat of the United Nations be of the highest integrity and not persons who have been, are, or are likely to be, engaged in espionage

15. The fact that plaintiff sought to shorten the discovery phase of this case, presumably to hasten the resolution of it, avails the defendant nothing in this context. While plaintiff contended that the discovery sought by the defendant was irrelevant and resisted it, plaintiff also willingly stipulated that all government documents produced are relevant and admissible. Defendant was in no way foreclosed from sup-

plementing the record by producing whatever documents, under its own control, which might have supported its case.

16. The basis of the Court's impression will be explained in detail in the final section of this Memorandum.

or subversive activities against the United States;".

(Quoted in Defendant's Memorandum in Support of Motion to Dismiss/Summary Judgment, Doc. # 36 at 3). Conceding that this is an important interest, it would be ludicrous to conclude that the Order as it is written approaches the "precision of regulation" contemplated by the Supreme Court in situations where government regulation impinges upon First Amendment freedoms. Our exhaustive analysis of the means used to fulfill the government's stated purpose reveals that the procedures for obtaining a loyalty clearance are not narrowly drawn to reach only subversion, espionage or even lack of integrity. Instead, a wide range of activities and associations may be examined, and the resulting advisory opinion purports to pass upon the individual's "loyalty", a vague and sometimes illusory concept.

Another inherent problem is the fact that the need for an advisory opinion as to loyalty extends to all employees or prospective employees of international organizations regardless of their duty stations or the nature of their duties. In *United States v. Robel, supra,* the Supreme Court could find no justification for requiring that anyone employed in any defense facility be required to renounce his membership in the Communist Party. The Court concluded that while the government had a substantial and important interest in minimizing the danger of sabotage and espionage in the defense industry, it could not regulate the associations of workers in non-sensitive positions.

Here, the government made no effort to identify specific positions that might implicate significant foreign policy concerns of the United States. Instead, it seeks to justify the loyalty clearance program on the insubstantial and conclusory basis that all employees of international organizations are *"de facto"* representatives of the United States and have "affirmatively chosen to enmesh themselves in the delicate foreign affairs concerns of the United States". (Defendant's Memorandum in Support of Motion to Dismiss/Cross Motion for Summary Judgment, Doc. # 36, at 54, 63). Just as the Supreme Court declined to allow "war powers" to "be invoked as a talismanic incantation" to support overbroad Congressional action because even that power "does not remove constitutional limitations safeguarding essential liberties", *United States v. Robel,* 389 U.S. at 263, 264, 88 S.Ct. at 423, 424 (citations omitted), so this Court, for the same reason, may not allow the President's power over foreign affairs to be invoked in that manner.

A closer scrutiny of the government's rationale for the loyalty clearance program, particularly as it concerns the plaintiff in this case, reveals the true nature of what the government seeks to accomplish and clearly illustrates why it is legally and constitutionally impermissible. The *Ozonoff* court concluded, and we agree, that the government's interest in regulating the employment of United States citizens by international organizations is more attenuated than if the individuals subject to investigation were employees of this government. In doing so, the court observed that:

> The appellee is a medical doctor. He does not want to represent the United States abroad, engage in diplomacy, or practice politics. His object—prolonging human life—is technical and scientific, not political. His employer is an international organization, not the American government. *Ozonoff* at 232, 233.

Although we believe that only the last sentence of the foregoing observation is truly relevant to the issue, the government argues vigorously and at length that the issue of expertise was essential to the result reached in the *Ozonoff* case. Upon that premise, the government argues that Hinton does not fit the criteria set forth by the First Circuit and, hence, that it has a stronger interest in investigating his loyalty. To support that contention, the defendant characterized the plaintiff as an "author of political propaganda who resides on a one-man farm" and who "has interacted with international political figures and practices politics". (Defendant's Response

to Plaintiff's Reply, Doc. #37, at 12, Defendant's Memorandum in Support of Motion to Dismiss/Cross Motion for Summary Judgment, Doc. #36, at 14).

Thus, it appears that the government is contending, at the least, that politically active citizens who seek to work for international organizations in whatever capacity ought to be subject to investigations into their loyalty to the United States. Moreover, the defendant also seems to suggest that the burden should be on the employee or prospective employee to "establish his bona fides as a technical expert". (Defendant's Response to Plaintiff's Reply, Doc. #37, at 12). Underlying this contention is the notion that a citizen who has engaged in protected First Amendment speech or associational activities can be presumed not to be a scientific or technical expert unless and until he can prove otherwise to the satisfaction of the government. This reasoning is flawed, both as a matter of law and as a matter of logic. In the first instance, such a position was soundly rejected by the Supreme Court in *Regan v. Time, Inc.*, 468 U.S. 641, 104 S.Ct. 3262, 3266–67, 82 L.Ed.2d 487, 494 (1984) where it held that, "Regulations which permit the government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment". (Citations omitted). Thus, the government is not permitted to evaluate the credentials of an individual claiming expertise with reference to the political content of his work, much less shift the burden of establishing expertise to the person who has exercised his right to engage in political speech.

Second, there is no logical reason to assume that political activity or speech, however extreme, precludes expertise in a scientific or technical discipline. In the context of employment by an international organization, expertise is a function of the marketplace. There is no basis for engaging in an independent evaluation of expertise if the international organization seeking to hire a United States citizen is satisfied that he or she is an expert in a particular field or otherwise qualified. Even a "one-man" farmer may have knowledge and expertise relevant to the interests of a world organization concerned, at the moment, with "one-man" farms in some remote area plagued by starvation.

From the government's more general defense of the loyalty clearance program, it appears that it seeks to use the Executive Order, if necessary, to discriminate against United States citizens on the basis of their political beliefs and activities. Defendant's most basic rationale for the Order can best be summarized by the following:

> In addition, ... the international organization will not be misled into assuming that, for example, if it assigns such an individual to a 'balanced' team (one representing the conflicting interests of the constituent members of the international organization), that the organization is thereby fairly representing the interests of the United States on that team. (Defendant's Brief in Support of Motion to Dismiss/Summary Judgment, Doc. #36, at 49).

This statement goes far beyond the purportedly necessary assurances that United States citizens employed by international organizations are persons of high integrity. Rather, it indicates that the government feels justified in trying to prevent the employment of those citizens whose political views are disapproved by government officials. It also renders the term "loyalty" as used in the Order less vague, although no less illegal, seeming to define it in terms of political orthodoxy. As the plaintiff points out, loyalty to the government in that sense is doubly precarious since the precise meaning and application of the term will shift with the inevitable shifting of political winds.

In sum, the government's sincere assurances that the Order is not intended to be applied unconstitutionally are not enough to save the loyalty clearance program. If the government continues to maintain a need to involve itself in the employment of United States citizens by international organizations, it will have to narrow, clarify and better articulate the nature, extent and

details of its interest. Moreover, in attempting to vindicate whatever interest it ultimately asserts, it must do so in a manner more narrow and specific than the existing program, which we will invalidate and enjoin in its entirety.

Having thus considered at length the issues presented with respect to Executive Order No. 10422, we now turn to a development which occurred during the pendency of this matter before this Court, namely, the publication on March 11, 1985, by the OPM, of notice of proposed amendments to the regulations implementing the Executive Order. That notice provides that comments with respect thereto must be received on or before May 12, 1986. It remains to be seen whether the regulations will thereafter be amended, when or in what particulars. Notwithstanding future uncertainties the proposed changes or amendments were submitted to the Court on March 11, 1986, as "Defendants' Notice of Changed Regulations" and "In Support of * * * earlier pleadings". (Document # 39).

Thus, we are invited to consider the proposed changes in the regulations. We accept that invitation as one designed to obtain the reaction of this Court to the proposed regulatory changes. We do not accept such invitation as a request to render an advisory opinion and we do not do so.

Rather for informational purposes only we turn to the regulations in question, found at 5 C.F.R. § 1501.8, which are little more than a repetition of Part II 1 and 2(a)-(e) of Executive Order No. 10422. Insofar as the language of the regulation differs in some particulars from the language of the Order itself, we conclude that the regulations are somewhat broader than the Order. Consequently, the analysis of Part II of the Order, found at pages 1032–35, *supra*, applies with equal force to the proposed regulations as presently written.

In the "Notice of proposed rulemaking", dated March 11, 1986, the Office of Personnel Management (OPM) expressed its intention to respond to previous judicial concerns that the regulation is overly broad and vague. It proposes to do so by substituting purportedly clearer and more precise language in the regulation, but not the Order itself. Such action is commendable and might eliminate some particularly egregious First Amendment violations if the regulations would ultimately provide a final and authoritative interpretation of the Order and firmly establish how it is to be enforced in the future. However, the proposed regulatory amendments do not accomplish that result and will not render the Order constitutional. Without engaging in an additional prolonged review and discussion of language which we, and other courts, found objectionable in the Order and which is only partially remedied by the proposed amendments to the regulations, we re-emphasize our concern that the Executive Order, its unrestricted language still extant, impermissably interferes with the exercise of important First Amendment freedoms. This concern is neither alleviated nor substantially mitigated by proposed amendments to the implementing regulations, which have not yet become effective.

Moreover, as noted, the proposed amendments, even if adopted, will not completely eliminate the deficiencies identified in Part II of the Executive Order, much less address language in other portions of the Order which is also constitutionally objectionable. At best, the regulations provide only a partial authoritative interpretation of the Order. Thus, with or without amendment, the regulations do not serve to change the result with respect to the Order itself.

Finally, it is evident that the proposal to amend the regulations confirms our original conclusion that the proponents of a challenged Order, not the courts, bear the burden of rewriting it so that it conforms to constitutional requirements. Our review of the proposed amendments also confirms our suspicion that piecemeal attempts, no matter how sincere, to save the Order as it presently exists, are or will be ultimately ineffective.

A thorough and thoughtful overhaul of the original Order and the entire program

**1040**

is required. Belated and intermittent responses to court decisions cannot provide the exhaustive review required, from the underlying rationale through the design and execution of procedures pursuant thereto, which are fundamentally necessary to a constitutional program. While such an undertaking is burdensome, it is essential. The burdensome result and the necessity for same cannot, in our opinion, be avoided considering the multiple constitutional guarantees afforded our citizenry. The problem is complicated by the fact that some such constitutional guarantees impinge upon others and the line to be delicately drawn must sometimes remain shrouded in uncertainty until ultimately and finally determined by judicial decision.

As previously stated, an appropriate order will issue invalidating and enjoining the Order in question.